UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| HAROLD RALEY AND ) | |
| CHERYL RALEY, d/b/a ) | |
| RALEY ENTERTAINMENT, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Case No. 3:04-0877 |
| v. ) | Judge Trauger |
| ) | |
| CHARLES P. JACKSON, individually and ) | |
| d/b/a GREEN PARK ASSOCIATES, ) | |
| ROBERT E. VAIL, JR., ) | |
| MICHAEL R. ALLEN, LARRY SMITH, and ) | |
| STEPHEN PATTERSON, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM

Pending before the court is the Motion for Summary Judgment filed by the counter-plaintiff (Docket No. 137), to which the counter-defendants have responded (Docket No. 143), and the counter-plaintiff has replied (Docket No. 148-1). For the reasons discussed herein, the counter-plaintiff's motion will be granted. The counter-plaintiff's counterclaim will be enforceable jointly and severally against each of the plaintiffs, *i.e.*, Harold and Cheryl Raley and Raley Entertainment.[1]

---

[1]While the consulting agreement at issue in this case reflects an agreement "by and between Michael R. Allen and Raley Entertainment," Ms. Raley signed the line of the agreement that called for "Signature of Client" in her name alone. (*See* Docket No. 138-2 at 1.) In her affidavit, however, Ms. Raley indicates that "Raley Entertainment contracted with Michael Allen . . . ." (*See* Docket No. 147-1 ¶ 7.) Allen refers to the counter-defendants as "the Raleys" but does not explicitly address whether they should be held liable in their individual capacity. (*See* Docket No. 148 at 1.) Neither party has addressed whether a "corporate veil" exists here or

1

**FACTS AND PROCEDURAL HISTORY**

Counter-defendants Harold and Cheryl Raley, doing business as Raley Entertainment ("the Raleys") initially brought suit against a number of defendants, including Michael R. Allen ("Allen"), the counter-plaintiff here, for fraud and breach of contract allegedly committed in connection with a series of concerts, titled the "Breakin' Ground Tour and Expo," that was scheduled for 2003. (*See* Docket No. 138-1 at 1-2.) Allen's counterclaim against the Raleys, which is the subject of this Memorandum, is all that remains of the Raleys' lawsuit. (*See id.* at 2.)

Through his counterclaim, Allen seeks to recover damages that the Raleys allegedly owe him pursuant to a consulting agreement, under which Allen was to oversee the contracting of sound, light, video and transportation services for the Breakin' Ground Tour. (*See* Docket No. 144 ¶ 3.) Allen presented this agreement to the Raleys on June 10, 2003, and Cheryl Raley signed it that day. (*See id.* ¶ 4.) Allen signed the agreement on June 12, 2003. (*See id.* ¶ 5.)

Under the terms of this agreement, the Raleys were to pay Allen $23,500 for his services on each of the tour's scheduled dates. (*See* Docket No. 138-2 at 1.) The agreement explicitly

---

whether, if so, it should be pierced.
     Although the counter-defendants argue that "under no circumstances is Mr. Allen entitled to a judgment against the Raleys individually," they never allege that Raley Entertainment is a corporate entity. (*See* Docket No. 143 at 1 n.1.) In their Complaint, the counter-defendants refer to Raley Entertainment merely as "a business operated in Houston County, Alabama." (*See* Docket No. 25, Original File, Complaint for Breach of Contract and Fraud ¶ 1 (transferred from the United States District Court for the Middle District of Alabama, Southern Division) ("Complaint").)
     Because the court has before it no proof that Raley Entertainment is a corporate entity deserving of the protections that accompany corporate status, it finds that all of the counter-defendants are jointly and severally liable on Allen's counterclaim. For the sake of convenience, the court will refer to Harold and Cheryl Raley d/b/a Raley Entertainment as "the Raleys" throughout its Memorandum.

2

states that, "[i]f tour is terminated prior to scheduled dates, Client [the Raleys] will be responsible and liable for 50 percent of each remaining date, payable to Consultant [Allen]." (*See id.*) According to Allen, the tour was originally scheduled for twenty dates but was canceled after the first two dates. (*See* Docket No. 144 ¶ 7.) The Raleys disagree and assert, instead, that they never canceled any tour events, but rather chose not to schedule any dates past the first two.[2] (*See id.* ¶ 8.) Allen claims that, pursuant to the agreement's termination clause, the Raleys now owe him fifty percent of his $23,500 fee for each of the eighteen shows that allegedly were canceled, or a total of $211,500. (*See* Docket No. 138-1 at 2.)

## ANALYSIS

Allen now moves for summary judgment on his counterclaim against the Raleys. The Raleys contest Allen's claim on a number of grounds, including (1) the parties "never formed a contract for more than two shows"; (2) the termination provision in the consulting agreement qualifies as an "improper penalty" and, therefore, is unenforceable; and (3) even if Allen is entitled to damages, he is not entitled to the full amount he has requested because he "has not met his obligation to mitigate his damages." (*See* Docket No. 143 at 1.) The Raleys further argue that, if this court finds that they owe damages to Allen, a Rule 56(f) continuance is necessary in order to allow them to conduct discovery as to the amount of damages to which Allen might be entitled. (*See id.* at 1-2 (citing Fed. R. Civ. P. 56(f)).)

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted

---

[2]The court notes that this assertion by the Raleys contradicts their allegations in the Complaint that "[t]our dates were scheduled for 20 dates initially." (*See* Complaint ¶ 25.)

3

if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd*., 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the nonmoving party fails to make a sufficient showing on an essential element of the case with respect to which she has the burden, however, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To preclude summary judgment, the nonmoving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). If the

evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 430 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49).

**I.      No genuine issue of material fact exists as to whether the parties formed a contract for more than two shows.**

The Raleys argue that they never contracted with Allen for anything more than the first two shows of the tour and that the arrangements as to those two shows were established by oral contract alone. (*See* Docket No. 143 at 5.) They claim that, as evidenced by the fact that Allen acted "contrary to the terms" of the written contract following its execution, no meeting of the minds existed between the parties as to that contract and, thus, it is unenforceable. (*See id.* at 6.)

Tennessee law governs this dispute. (Docket No. 138-2 at 1 ("The laws of the State of Tennessee shall govern this agreement.").) Under Tennessee law, a meeting of the minds as to the essential terms of a contract is necessary in order for the contract to be binding. *See Wills & Wills v. Gill*, 54 S.W.3d 283, 286 (Tenn. Ct. App. 2001). A mutuality of mind is evident in a contract when the acceptance "mirrors the essential terms of the offer." *See Stinson v. Crye-Leike, Inc.*, 198 Fed. App'x 512, 515 (6th Cir. 2006) (unpublished).

When interpreting the language of a contract, the primary goal of a court should be to "ascertain the mutual intention of the parties and then, so far as it is possible to do so consistently with legal principles, give effect to that intention." *Vision Info. Servs. v. Comm'r of*

5

*Internal Revenue*, 419 F.3d 554, 558 (6th Cir. 2005) (internal quotation omitted). The Sixth Circuit has explained that "the intent of the parties is best determined by the plain language of the contract." *Id.* (internal quotation omitted). Importantly, "it is not the real intent but the intent expressed or apparent in the writing which is sought; it is the objective, not the subjective, intent that controls." *Id.* (quoting 11 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 31:4 (4th ed. 1999) ("Williston on Contracts")).

Both the Sixth Circuit and Tennessee courts hold that a meeting of the minds between two parties to a contract exists where clear, unambiguous contractual language reveals both offer and acceptance. *See Vision Info Servs.*, 419 F.3d at 559 ("the unambiguous language of the . . . [a]greement reveals the parties' primary intention to . . . enter into [an agreement]"); *Sutton v. First Nat'l Bank of Crossville*, 650 S.W.2d 526, 532 (Tenn. Ct. App. 1981) ("The defendant offered to provide credit insurance and Mr. Sutton accepted the defendant's offer. There was a meeting of the minds.")

Here, the parties agree that they each executed the one-page consulting agreement that Allen presented to the Raleys on June 10, 2003. (*See* Docket No. 144 ¶¶ 4-5; Docket No. 138-2 at 1.) Other than the "payment" clause of this agreement, which the court will address below, the language of this agreement, like that in *Vision Information Services* and *Sutton*, clearly and unambiguously–albeit briefly–lays out the terms of the parties' agreement. (*See* Docket No. 138-2 at 1.) Thus, the literal meaning of the contract's language controls the outcome of the parties' dispute, and the court need not look to extrinsic evidence for further clarification as to their intentions. *See Vision Info Servs.*, 419 F.3d at 559 ("Because we find the language of the . . . [a]greement to be clear and unambiguous, reliance on extrinsic evidence of the parties' intent is

6

unnecessary."); *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006) ("If the language [of a contract] is clear and unambiguous, the literal meaning controls the outcome of the dispute.").

After examining this language, the court finds that a meeting of the minds existed between the two parties, under which Allen was to advance all scheduled dates of the tour, oversee the contracting of the sound, lights, video and transportation of the tour, and either serve as, or provide a production manager for, each of the tour's scheduled dates. (*See* Docket No. 138-2 at 1 ¶¶ 1(A)-1(B).) In return, the Raleys were to pay Allen "$23,500.00 per scheduled dates (See Attachment One)." (*Id.* ¶ 7.) The "[t]ermination" clause of the agreement reads as follows: "If the tour is terminated prior to scheduled dates, Client will be responsible and liable for 50 percent of each remaining date, payable to Consultant." (*Id.* ¶ 8.)

If any ambiguity exists as to the terms of the agreement, it is with respect to the term "scheduled dates." The portion of the agreement that addresses the tour's scheduled dates references "Attachment One." (*See id.* ¶ 7.) Attachment One itself lists twenty dates and locations.[3] (*See* Docket No. 147-2 at 1.) An examination of this attachment reveals a number of faint marks, one of which is recognizable as a question mark. (*See id.*) In addition, the first item on the list, "June 14, 2003–Little Rock, Arkansas," has a line through it. (*See id.*)

Cheryl Raley explains these notations in her affidavit. (*See* Docket No. 147-1 ¶ 11.) She asserts that she made these marks, which she acknowledges may appear only faintly on the

---

[3]Allen acknowledges that "attorneys for [him] . . . inadvertently attached the wrong lineup tour [sic] with the original filing" and recognizes that the version of Attachment One submitted by the Raleys is the correct exhibit. (*See* Docket No. 148-1 at 5; Docket No. 147-2 at 1.)

7

court's copy, herself.  (*Id.* ¶¶ 11-12.)  She notes that, in addition to crossing out the Little Rock date, she placed question marks next to eight dates.  (*Id.* ¶ 11.)

Ms. Raley does not state in her affidavit, and the court cannot determine from the party's filings, whether Ms. Raley made these notations before or after she signed the agreement.  If she made them beforehand, and therefore before Allen signed the contract, they likely are now part of the contract itself.  *See Safeco Ins. Co. of Am. v. City of White House, Tenn.*, 36 F.3d 540, 546 (6th Cir. 1994) (indicating that, under Tennessee law, if one party's acceptance does not mirror the offeror's terms, the acceptance operates as a rejection and a counteroffer); (Docket No. 144 ¶¶ 4-5 (indicating that Allen signed the agreement on June 12, 2003, two days after Cheryl Raley signed it)).

Assuming that Ms. Raley's notations are part of the contract, they could be construed to be ambiguous.  *See Allstate Ins. Co.*, 195 S.W.3d at 611 (recognizing that contractual language is ambiguous "only when it is of uncertain meaning and may be understood in more ways than one") (internal quotation omitted).  In such circumstances, a court "is permitted to use parol evidence, including the contracting parties' conduct and statements regarding the disputed provision" to guide it in construing and enforcing the contract.  *See id.*

Here, such evidence reveals a meeting of the minds between the two parties as to the meaning of Attachment One.  Ms. Raley explicitly states in her affidavit that, while she believed that none of the particular locations listed in Attachment One was final, she "intended to replace the locations indicated [by her notations] with locations closer to Alabama."  (*See* Docket No. 147-1 ¶ 12.)  Thus, she meant for the same number of shows as was listed on Attachment One to actually occur, although she anticipated that some of them might take place in different

8

locations. Similarly, Allen asserts that Attachment One "demonstrates planning and scheduling for 18 more shows." (*See* Docket No. 148-1 at 5) (recognizing that, while "dates often get changed in a tour . . . this does not negate the tour itself, nor . . . imply the performance was not to take place"). Thus, even if Ms. Raley's handwritten notations are a part of the parties' consulting agreement, they do not change the court's conclusion that a meeting of the minds existed between the parties as to each of the agreement's essential terms.

The Raleys attempt to garner further support for their contention that the parties never had a meeting of the minds as to the consulting agreement from the fact that a number of alleged discrepancies exist between the terms of the agreement and the parties' behavior following its execution. (*See* Docket No. 143 at 4-5.) As noted above, however, because the language of the agreement is clear and unambiguous–with the exception of the "scheduled dates" language, on which the court has already found a mutuality of mind–the court need not look to extrinsic evidence in order to determine whether a meeting of the minds existed. *See Vision Info. Servs.*, 419 F.3d at 559.

Further, the Raleys do not argue that any of the ways in which Allen allegedly acted in a manner that was contrary to the language of the consulting agreement qualifies as a contractual breach that would have justified rescission of the agreement. *See Lopez v. Taylor*, 195 S.W.3d 627, 635 (Tenn. Ct. App. 2005) (recognizing that, in some situations, one party to a contract may terminate its performance under a contract in response to the other party's conduct); (Docket No. 143 at 4-5 (listing instances in which Allen allegedly acted in a manner contrary to the language of the agreement)); Williston on Contracts § 63:3 ("[I]f a breach is relatively minor and not of the essence, the plaintiff is still bound by the contract and may not abandon performance and

9

obtain damages for a total breach by the defendant . . . ."). Accordingly, no genuine issue of material fact exists as to whether the parties formed a contract under which Allen was to provide the Raleys with services during each of the shows on the Breakin' Ground Tour.

In addition, although the parties dispute the number of the shows scheduled to occur during the tour, they agree that Attachment One reflects the number of shows intended to take place. (*See* Docket No. 147-1 ¶ 12; Docket No. 148-1 at 5.) While the Raleys assert that only eighteen dates appear on the attachment, the court's own count indicates that the attachment lists twenty dates in all. (*Compare* Docket No. 143 at 6 (asserting that Attachment One "only lists <u>eighteen</u> intended dates) (emphasis in original) *with* Docket No. 147-2 (indicating twenty dates).) Allen similarly asserts that the tour was scheduled for twenty dates total, only two of which actually took place. (*See* Docket No. 148-1 at 5 (reflecting Allen's argument that Attachment One "demonstrates planning and scheduling for 18 <u>more</u> shows") (emphasis added)). Because (1) the parties do not dispute that Attachment One was attached to the consulting agreement at the time of its execution; (2) Attachment One reflects, in fact, twenty dates; and (3) the parties similarly do not dispute that only two of the scheduled performances actually took place, no genuine issue of material fact exists as to whether the tour was terminated with eighteen shows remaining. (*See also* Docket No. 148-4 at 1 (reflecting an agreement between the Raleys and a third party that indicates that the Raleys agreed to compensate the third party in the amount of "$2500 . . . per show date of twenty (20) dates.").) Thus, if the agreement's per-show termination provision is enforceable, damages should be calculated with the understanding that, in addition to the two shows that actually took place, eighteen shows were scheduled to occur.

10

**II.     No genuine issue of material fact exists as to whether the termination provision in the consulting agreement qualifies as an enforceable liquidated damages provision.**

The consulting agreement executed by the parties contains a "termination provision" that requires the Raleys to pay Allen "50 percent [of his per-show fee of $23,500] of each remaining date" for each tour date that was scheduled but did not take place. (*See* Docket No. 138-2 at 1.) Thus, if this provision is enforceable, the Raleys will owe Allen $11,750 for each of the eighteen scheduled tour dates that never took place–a total of $211,500. (*See* Docket No. 138-2 at 1; 138-1 at 2.) The Raleys assert that this provision "is an improper penalty and should be disregarded." (*See* Docket No. 143 at 6.) Allen argues that this provision is not a penalty, but rather a liquidated damages provision that reasonably reflects the actual harm that he experienced due to the Raleys' termination of the 18 tour dates. (*See* Docket No. 138-1 at 11-13.)

Under Tennessee law, the term "liquidated damages" "refers to an amount determined by the parties to be just compensation for damages," should a contract breach occur. *Vanderbilt Univ. v. DiNardo*, 174 F.3d 751, 755 (6th Cir. 1999). The fundamental purpose of a liquidated damages provision is to provide a means of compensation in the event of a breach where damages would be indeterminable or otherwise difficult to prove. *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 98 (Tenn. 1999).

Tennessee courts "have long recognized the freedom of parties to agree upon terms that may not appear desirable to outsiders and the duty of the courts to refrain from interfering with the parties' agreement unless to enforce it would violate established public policy." *Anesthesia Med. Group v. Chandler*, No. M2005-00034-COA-R3-CV, 2007 WL 412323, at *9 (Tenn. Ct. App. Feb. 6, 2007) (slip op.). The courts will uphold a liquidated damages provision if "the

11

liquidated damages specified were a reasonable prediction of what a breach would cost the injured party in light of circumstances at the time the contract was formed." *United States v. Ponnapula*, 246 F.3d 576, 584 (6th Cir. 2001). Notably, under this approach, "the amount of actual damages at the time of breach is of little or no relevance to whether the clause is an impermissible penalty." *Id.* (citing *Guiliano*, 995 S.W.2d at 99).

Courts will not enforce a liquidated damages provision, however, "if the stipulated amount constitutes a penalty." *See Vanderbilt Univ.*, 174 F.3d at 755 (citing *Beasley v. Horrell*, 864 S.W.2d 45, 48 (Tenn. Ct. App. 1993)). A penalty is "designed to coerce performance by punishing default." *Id.* Any doubt as to the character of a contract provision "will be resolved in favor of finding it a penalty." *Id.*

The Raleys argue that the $11,750 that the consulting agreement would have them pay Allen for each of the eighteen canceled shows is not a reasonable prediction of what their breach would have cost Allen because, due to the fact that Allen subcontracted a number of his duties to Theatrical Media Services ("TMS"), he "retained only $3,500 for each of the two scheduled performances which occurred." (*See* Docket No. 143 at 7.) Additionally, they argue that the amount is unreasonable because the parties may have predicted that Allen could have obtained other employment were a breach to occur "and thus he may not have suffered damages at all." (*See id.*) Finally, they allege that, because Allen knew that the number of tour dates was uncertain, he could not reasonably have anticipated being harmed by the shows' nonoccurrence such that collecting damages for such would have been reasonable. (*See id.*)

Allen, on the other hand, asserts that the consulting agreement's termination provision reflects an amount that is reasonably proportional to the damages he would suffer upon a breach

12

of the agreement. (*See* Docket No. 138-1 at 12.) He argues that "[i]t was in fair contemplation of the parties that, if Mr. Allen was terminated prior to the tour's scheduled end, he would not be able to find a comparable position at the same salary or he would suffer damages that would be difficult to prove." (*See id.*) He alleges that "it was only in reliance on the Raleys' representations and agreement regarding the termination clause" that he entered into the agreement and that "the Raleys were aware [that], upon their cancellation of the remaining eighteen show[s], it was too late for Mr. Allen to secure work with another tour for that season." (*Id.*) Finally, Allen notes that, under the terms of his subcontract with TMS, which also included a fifty percent liquidated damages clause, he currently owes TMS $180,000.[4] (*Id.*)

Because Allen could not determine, at the time of the agreement's execution, whether he would be able to find new employment if the tour were canceled or, if so, at what rate he would be compensated, the court agrees with his assertion that, upon breach of the agreement, his exact damages would be indeterminable or difficult to prove. *See Guiliano*, 995 S.W.2d at 98; (Docket No. 138-1 at 12). The court must further determine, however, whether, viewed prospectively, fifty percent of his $23,500 fee for each show was a reasonable estimate of the damages he would suffer upon the tour's cancellation.

The Sixth Circuit has held that a liquidated damages provision that provided an employee who was terminated without cause with his full salary from his date of termination until a

---

[4] Although the Raleys list Allen's subcontract with TMS as one of the bases for their argument that Allen acted in a manner that was contrary to the terms of the consulting agreement following the agreement's execution, the agreement did not forbid Allen from contracting out the services he was to provide. (*See* Docket No. 143 at 4-5.) Rather, it explicitly stated that Allen was to "<u>oversee contracting</u> of sound, lights, video and transportation . . . ." (*See* Docket No. 138-2 ¶ 1(A) (emphasis added).)

13

predetermined future date reasonably related to the damages the employee might incur upon his termination, where "it was in the fair contemplation of the parties," at the time they executed the contract, that the employee "might not be able to find a similar professional position at the same salary and that he might suffer damages that would be difficult to prove . . . ." *See Guiliano*, 995 S.W.2d at 101. Similarly, the Tennessee Supreme Court found a liquidated damages provision to be reasonable where it allowed a seller of a motel to retain the reneging buyers' earnest money, which amounted to fifteen percent of the motel's purchase price plus the interest accrued thereon, where the seller "could not know what price (if any) it would get for the property if the initial sale fell through." *See Ponnapula*, 246 F.3d at 584.

Although the Raleys do not provide any examples of unenforceable termination provisions, the court has located one such provision that is particularly relevant to its holding in this case. (*See* Docket No. 143 at 6-7.) In *Eatherly Construction Co. v. HTI Memorial Hospital*, the Tennessee Court of Appeals affirmed a dismissal of a claim for liquidated damages where a contract called for $500 in damages for each day that construction of a hospital was delayed. *See Eatherly Constr. Co. v. HTI Mem'l Hosp.*, No. M2003-02313-COA-R3-CV, 2005 WL 2217078, at *9 (Tenn. Ct. App. Sept. 12, 2005) (unpublished). Although the parties had agreed to that amount in advance, the court found no evidence to support a finding that the fee was a reasonable estimate of damages that would be incurred by the hospital. *See id.*

As in *Guiliano*, the notion that Allen might not be able to find a similar position at the same salary "was in the fair contemplation of the parties" here. *See Guiliano*, 995 S.W.2d at 101. Indeed, Allen states in his affidavit that, "[a]fter the cancellation of the Breakin['] Ground Tour by the Raleys, it was too late in the season to secure work for another tour." (*See* Docket

14

No. 151 ¶ 20.)  In addition, he asserts that, in the music industry, "contracts are formed for these types of services months in advance."  (*See* Docket No. 148-1 at 8; Docket No. 151 ¶ 15.) Similarly, like the seller in *Ponnapula*, Allen had no way of knowing what price, if any, his services would command, were his contract with the Raleys to fall through.  *See Ponnapula*, 246 F.3d at 584.  Accordingly, like the termination provisions in *Guiliano* and *Ponnapula*, the one here qualifies as a reasonable estimate of the damages that Allen might suffer upon the tour's cancellation.

*Eatherly* does not alter this finding, as it is distinguishable from the case at hand.  In *Eatherly*, unlike in this case, the hospital demonstrated no relationship between its actual damages and the $500-per-day fee it sought.  *See Eatherly Constr. Co.*, 2005 WL 2217078, at *9.  The court in *Eatherly* explicitly contrasted the improper $500 fee with the "relevant and material economic value" of the fee employed in *Guiliano*, *i.e.*, the employee's salary.  *See id.* ("The significance of this value is that the parties did not pull a figure out of the air.").

Nor did the parties in this case "pull a figure out of the air."  As in *Guiliano*, where the fee equaled one hundred percent of the employee's salary, and *Ponnapula*, where the fee constituted fifteen percent of the motel's purchase price, the damages here, at fifty percent of Allen's per-show compensation, reasonably reflected his potential actual damages.  *See Guiliano*, 995 S.W.2d at 101; *Ponnapula*, 246 F.3d at 584; (Docket No. 138-2 at 1).  The fact that Allen allegedly owes TMS $180,000 pursuant to the liquidated damages provision in his contract with it lends further support to the reasonableness of this estimation, as the parties could have foreseen upon signing the agreement that such debts to subcontractors might arise were the tour to be canceled.  (*See* Docket No. 148 at 9.)

15

Thus, because the consulting agreement is generally enforceable and evidences a commitment between the Raleys and Allen that was to last the duration of twenty shows on the Breakin' Ground Tour and because the termination provision in that contract qualifies as a enforceable liquidated damages provision, Allen's motion for summary judgment will be granted.  (*See* Docket No. 137 at 1.)

In closing, the court notes that the Raleys' arguments as to whether Allen sufficiently mitigated his damages following the termination of the tour, as well as their requests for a continuance in order to further explore Allen's failure to mitigate and Allen's rebuttal of this request, are irrelevant to the issue of whether Allen is entitled to damages under the consulting agreement's termination provision.  The Sixth Circuit and Tennessee courts have emphasized repeatedly that "the extent of actual damages has no bearing on [a party's] recovery of liquidated damages . . . ."  *See Guiliano*, 99 S.W.2d at 101; *see also Ponnapula*, 246 F.3d at 584 (noting that, under the "prospective approach" adopted by the Tennessee Supreme Court in *Guiliano*, "the amount of actual damages at the time of breach is of little or no relevance to whether the clause is an impermissible penalty"); *Anesthesia Med. Group*, 2007 WL 412323 at *11 (indicating that evidence as to mitigation relates to actual damages, which "are of little or no relevance to the validity of the liquidated damages provision").  Thus, the Raleys' request for a continuance under Rule 56(f) is without merit.   (*See* Docket No. 143 at 1-2 (requesting a continuance in order to determine whether Allen has "met his obligation to mitigate his damages").)

16

## **CONCLUSION**

The consulting agreement at issue in this case is generally enforceable and evidences a commitment between the Raleys and Allen that was to last the duration of twenty shows on the Breakin' Ground Tour. Additionally, the termination provision in that agreement qualifies as an enforceable liquidated damages provision. As such, Allen's motion for summary judgment will be granted.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge